David A. Rosenzweig, Esq.
Melanie M. Kotler, Esq.
NORTON ROSE FULBRIGHT US LLP
666 Fifth Avenue
New York, NY 10103-3198
Telephone: (212) 318-3000
Facsimile:  (212) 318-3400
david.rosenzweig@nortonrosefulbright.com
melanie.kotler@nortonrosefulbright.com

Kristian W. Gluck, Esq.
Gregory M. Wilkes, Esq.
Timothy S. Springer, Esq.
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas  75201-7932
Telephone: (214) 855-8000
Facsimile:  (214) 855-8200
kristian.gluck@nortonrosefulbright.com
greg.wilkes@nortonrosefulbright.com
tim.springer@nortonrosefulbright.com

COUNSEL FOR THE PETITIONER MASAKAZU YAKUSHIJI,
FOREIGN REPRESENTATIVE OF DAIICHI CHUO KISEN KAISHA

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | § | |
| | § | **CASE NO. 15-12650** |
| **DAIICHI CHUO KISEN KAISHA,** | § | |
| | § | **Chapter 15** |
| Debtor in a foreign proceeding. | § | |

## VERIFIED PETITION FOR RECOGNITION AS FOREIGN MAIN PROCEEDING PURSUANT TO SECTIONS 1515 AND 1517 OF THE UNITED STATES CODE AND RELATED RELIEF AND MEMORANDUM IN SUPPORT

Now comes Masakazu Yakushiji, in his capacity as a President and foreign representative (the "Petitioner") of Daiichi Chuo Kisen Kaisha ("DCKK"), a debtor in a civil rehabilitation proceeding under Japanese law (the "Japan Proceeding"), currently pending as Case No. Heisei 27 (2015) (Sai) 53 before the 20th Civil Division of the Tokyo District Court, Japan (the "Tokyo Court"), respectfully submits this *Verified Petition for Recognition as Foreign Main Proceeding Pursuant to Sections 1515 and 1517 of the United States Code and Related Relief* (the "Petition"). Contemporaneously herewith, the Petitioner has filed an *Ex Parte Application for Temporary Restraining Order and, After Notice and a Hearing, a Preliminary Injunction,*

*Pursuant to Sections 1519 and 105(a) of the Bankruptcy Code* (the "Motion") seeking (i) the immediate entry, on an *ex parte* basis, of an order to show cause with a temporary restraining order, substantially in the form annexed to the Motion as Exhibit A, staying execution against the assets of DCKK, applying section 362 of the Bankruptcy Code in this chapter 15 case on a provisional basis, and scheduling a hearing on the Petitioner's request for a preliminary injunction, and (ii) after such hearing, the entry of a preliminary injunction order, substantially in the form attached to the Motion as Exhibit B, extending the relief in the temporary restraining order until the disposition of the Petition.   In support of the Petition and the Motion, the Petitioner respectfully states as follows:

## I.
## JURISDICTION, VENUE, AND CORE ALLEGATIONS

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b) and 11 U.S.C. § 1501 of the Bankruptcy Code.  Venue is proper in this district pursuant to 28 U.S.C. § 1410.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

2.      The statutory predicates for the relief sought herein are sections 1504, 1515, 1517, and 1520 of the Bankruptcy Code.

## II.
## PRELIMINARY STATEMENT

3.      DCKK is a Japanese-based international shipping company that has commenced civil rehabilitation proceedings in Japan, which is a foreign proceeding within the meaning of 11 U.S.C. § 101(23), in order to provide it with the protections needed to reorganize its financial affairs and maximize recoveries for all stakeholders.

4.      The Petitioner, a foreign representative within the meaning of § 101(24), commenced this chapter 15 case (the "Chapter 15 Case") by filing the instant Petition seeking entry of an order recognizing the Japan Proceeding as a foreign main proceeding pursuant to 11

U.S.C. § 1517, thereby granting related relief pursuant to § 1520 and additional relief pursuant to § 1521.

## III.
## EXPEDITED RELIEF REQUESTED

5.    The Petitioner seeks expedited relief of this Petition, in addition to the injunctive relief filed contemporaneously herewith to stay execution against DCKK's assets within the territorial jurisdiction of the United States, including DCKK's vessels that have entered, or will enter, ports of call in the United States, and therefore may be subject to arrest and attachment by DCKK's creditors prior to the anticipated recognition of the Japan Proceeding as a foreign main proceeding by this Court.

## IV.
## SUPPORT FOR THE PETITION

6.    The Petitioner attaches the following Exhibit to the Petition:

| Exhibit | Description |
|---------|-------------|
| A | Form of Order Granting Petition for Recognition as Foreign Main Proceeding Pursuant to Sections 1515 and 1517 of the United States Bankruptcy Code and Related Relief |

7.    The Petitioner also requests that the Court take judicial notice of the record in the above-referenced case and relies upon *Declaration of Masakazu Yakushiji in Support of the Petition for Recognition as Foreign Main Proceeding Pursuant to Sections 1515 and 1517 of the United States Bankruptcy Code and Related Relief* (the "Declaration") filed contemporaneously with the Petition.

## V.
## BACKGROUND

**A.    DCKK's Business**

8.    DCKK is a joint-stock company incorporated under Japanese law in 1960.  In addition to its principal domestic Japanese offices in Tokyo, Kansai, Wakayama and Kashima,

where the majority of DCKK's employees are located, DCKK has ancillary offices in New York

(opened in 1969), Manila, Hong Kong, London, Shanghai, Brisbane and Vietnam.  DCKK's core

business is marine transportation, providing overseas shipping, coastal shipping[1] and other

related services, focusing primarily on transporting dry bulk (bulk cargo such as unpackaged

grain, iron ore and other commodities) using a tramp steamer, commonly referred to as a

tramper.

9.    Unlike container ships that operate on a set route and set schedule, a tramper does

not have a fixed schedule or regular ports-of-call.  Instead, its schedule is determined according

to the request of cargo owners (i.e, the customers).  In general, a tramper often transports cargo

by time chartering vessels owned by a third party, or by using self-owned vessels or vessels

owned by its *shikumisen* subsidiary.[2]  In such case, a time charter contract is entered into

between a third-party vessel owner and the shipping company, and the charter hire (i.e, fees) are

usually specified in time charter contracts.  There are many tramper operators in the world, and

freight rates are often determined by the global market, based on the balance between demand

for shipping/transporting and supply of freight space.  The Baltic Dry Index (the "BDI"),

published by the Baltic Exchange, is a leading indicator for ocean route dry bulk carriers, and is

based on freight rates of trampers (the freight rate for 1985 was 1000, which serves as a

benchmark for the index.)  Based on this index, together with shipping routes, vessel type and

contract term, the freight rates are determined between cargo owners and shipping companies.

10.    DCKK's overseas shipping service is categorized into special-purpose vessel

---

[1] DCKK transports cargo such as limestone, cement, coal, crushed stone, grain and general goods by special-purpose vessels and general cargo vessels within Japan for domestic consumers.

[2] A *shikumisen* company is a company incorporated in countries where tax systems are advantageous to shipping companies.  The company registers and holds its vessels under that country's flags, or enters into bareboat charters with third parties; however, the vessels are actually used for the business of the parent company in accordance with time charter agreements between the *shikumisen* company and its parent company.

services and tramper services according to the types of vessels and their purposes.  DCKK's

special-purpose vessel service division is in charge of transporting specific freight, in particular

iron ore and coal for international and domestic steel mills by cape-size vessels (vessels with a

deadweight capacity of over 150,000 tonnage).  The tramper service division is made of two

sections: (i) the large-scale tramper service section, which uses panamax-size vessels (vessels

with a deadweight capacity of over 70,000 tonnage) and handymax-size vessels (vessels with a

deadweight capacity of over 40,000 tonnage) to transport cargo such as coal and nonferrous

metals to electric power companies and general industries, and (ii) the ocean tramper service

section, which uses handy-size vessels (vessels with a deadweight capacity of up to 40,000

tonnage) to transport various cargo including grain.

11.    As of March 31, 2015, the number of vessels owned by DCKK is as described in

the following table by size, which is classified by deadweight capacity tonnage:

| Vessel Size | Owned Solely by DCKK | Owned by Subsidiaries (Including Leased Vessels) | Chartered | Total |
|---|---|---|---|---|
| Cape-size (150,000 tonnage ~) | 1 | 3 | 20 | 24 |
| Panamax size (70,000 ~ 150,000 tonnage) | 1 | 5 | 23 | 29 |
| Handymax size (40,000 ~ 70,000 tonnage) | 0 | 2 | 21 | 23 |
| Handy size (20,000 ~ 40,000 tonnage) | 0 | 13 | 34 | 47 |
| Coastal waters vessels (~ 20,000 tonnage) | 0 | 12 | 31 | 43 |
| Vessels for coastal shipping | 5 | 3 | 11 | 19 |
| **Total** | **7** | **38** | **140** | **185** |

12.    As of August 1, 2015, DCKK had 224 employees, of which 162 are land-based

employees (including 2 seconded workers), 23 are sea-based (crew), 9 are temporary staff and

trainees, 1 is a part-time employee, and 3 are contract employees, and 26 are local employees of

the overseas affiliates and branches.  Thus, all but 26 of DCKK's employees are located in

Japan, and only 3 are located in DCKK's New York office.

B.      **DCKK's Capital Structure**

13.     As of June 30, 2015, DCKK had assets of approximately 54,502,000,000 yen on a

non-consolidated basis and approximately 107,292,000,000 yen on a consolidated basis:

| Item | Amount Non-Consolidated | Amount Consolidated |
|---|---|---|
| Current Assets | 33,076,000,000 yen | 41,199,000,000 yen |
| Tangible Fixed Assets | 9,399,000,000 yen | 61,921,000,000 yen |
| Intangible Fixed Assets | 44,000,000 yen | 117,000,000 yen |
| Investments and Other Assets | 11,983,000,000 yen | 4,054,000,000 yen |
| **Total** | **54,502,000,000 yen** | **107,292,000,000 yen** |

14.     As of June 30, 2015, DCKK had liabilities of approximately 119,607,592,978 yen

on a non-consolidated basis:

| Type of Debt | Amount | Number of Creditors |
|---|---|---|
| Financial Creditors (Banks) | 24,330,768,124 yen | 17 creditors |
| Creditors With Loans Receivable (Vessel Owners, Broker, etc.) | 2,285,933,759 yen | 23 creditors |
| Derivative Creditors | 117,178,095 yen | 1 creditor |
| Bond Holders (Private Placement Bonds) | 4,419,419,497 yen | 37 creditors |
| Guaranteed Creditors | 76,254,279,805 yen | 26 creditors |
| Lease Creditors | 61,794,100 yen | 4 creditors |
| Affiliate Company Creditors | 5,659,182,022 yen | 16 creditors |
| General Creditors | 6,434,884,040 yen | 461 creditors |
| Tax and Public Charge Creditors | 44,153,536 yen | 12 creditors |
| Total | 119,607,592,978 yen | 608 creditors |

C.      **Events Leading to the Commencement of the Japan Proceeding**

15.     Beginning in September 2008 with the global financial crisis caused by the

collapse of Lehman Brothers, a sizable drop in cargo movements took place worldwide.  In May

2008, the BDI was 11,067, but took a plunge in September 2008, and dropped to 666 by

December 2008.  The downturn in the shipping industry greatly impacted DCKK given that it

relies heavily on voyage charter vessels for a large percentage of its business.

16.     Before the collapse of Lehman Brothers, DCKK was working on expanding its fleet, entering into many long-term time charter agreements between ship owners that obligated it to pay a substantial amount in charter fees, whereas most charter party agreements are spot contracts, and freight rates are based on the then-stagnant maritime market.  Therefore, the charter fees that DCKK had to pay were quite high, while freight charges paid to DCKK remained very low, and as a result, DCKK ended up in a "backwardation" in which the charter fees exceeded its freight revenue.  In addition, factors such as the increase in debt burden due to newly-built vessels, a lack of funding, the rise of the Japanese yen and the rise of fuel prices contributed to DCKK's worsening cash-flow problems.

17.     For the fiscal year ending March 2009, DCKK's operating profit showed a 93.3% decrease over the previous year, resulting in an ordinary income loss of 2,118,000,000 yen and net income loss of 3,635,000,000 yen, and, on a consolidated basis, an ordinary income loss of 928,000,000 yen and current net loss of 2,939,000,000 yen.

18.     After 2009, DCKK began terminating charter parties in an attempt to reduce vessel expenses, and it regained profitability during the fiscal year ending March 2011, the last fiscal year it would post an operating profit.  Subsequently, DCKK tried to take advantage of the decreasing ship prices and resumed its fleet expansion in anticipation of market recovery. However, the market continued to decline, and, for the fiscal year ending March 2012, DCKK posted an ordinary income loss of 11,775,000,000 yen and net income loss of 12,588,000,000 yen, and, on a consolidated basis, an ordinary income loss of 11,002,000,000 yen and current net loss of 9,281,000,000 yen.

19.     In late 2012, DCKK began to (i) adjust the scale of its fleet by increasing the

percentage of medium and small-sized vessels (which were expected to be in high demand) to secure a steady income, (ii) cut costs by terminating charter parties for about 20 of the high-cost vessels, and (iii) increase capital and secure operating funds by selling owned vessels and issuing classified stock,[3] as well as deferring loans and charter fee payments.  However, the recovery of the medium and small-sized vessel market was moderate, and there was also a need to pay extensive cancellation fees in order to terminate charter parties of high-cost vessels causing "backwardation".  As a result, for the fiscal year ending March 2013, DCKK posted an ordinary income loss of 20,128,000,000 yen and net income loss of 32,301,000,000 yen, and, on a consolidated basis, an ordinary income loss of 18,563,000,000 yen and current net loss of 31,983,000,000 yen.

20.    In March 2014, DCKK increased capital and secured operating funds by issuing more classified stock,[4] downsized its fleet, made cost reductions and restructured its tramper services business in Asian waters.  DCKK anticipated that these measures would reduce losses for fiscal year 2014 to be 3,300,000,000 yen.  While DCKK's tramper services in Asian waters (mainly Southeast Asia, China, Russia) and its domestic shipping business improved, market conditions in the shipping industry continued to deteriorate, and by the end of 2014, the cape-size vessel market reached an all-time low.  As a result, for the fiscal year ending March 2014, DCKK posted an ordinary income loss of 4,366,000,000 yen and net income loss of 13,459,000,000 yen, and, on a consolidated basis, an ordinary income loss of 8,584,000,000 yen and current net loss of 15,429,000,000 yen.[5]

---

[3] DCKK raised 31,400,000,000 yen by issuing class A shares to its largest shareholder, Mitsui O.S.K. Lines, Ltd., and other business partners.

[4] DCKK raised 8,500,000,000 yen by issuing class D shares to outside investors.

[5] The loss for fiscal year 2014 includes a provision for loss (5,900,000,000 yen) relating to the first instance verdict in the Ocean Victory litigation in the UK High Court of Justice.  In 2006, the "Ocean Victory", a cape-size bulk carrier time-chartered by DCKK from the vessel owner (China National Chartering Corp.) to transport iron ore

21.    The gap between supply and demand for medium-sized vessels (excluding cape-size vessels) continued into 2015.  As a result, it became difficult for DCKK, who mainly focuses its business on transporting dry bulk using trampers (which is greatly influenced by the maritime market), to generate profit as its revenue continued to decline due to the market's prolonged stagnation, and DCKK has been stuck in the same inextricable situation.  DCKK's performance for the fiscal year of March 2015 was an ordinary income loss of 14,256,000,000 yen and net income loss of 2,660,000,000 yen, and, on a consolidated basis, an ordinary income loss of 13,966,000,000 yen and current net loss of 3,307,000,000 yen (including 3,412,000,000 yen as profit from the sale of vessels and 5,763,000,000 yen to reverse a provision for loss on litigation after winning the appeal in the Ocean Victory litigation pending in the UK).

22.    Beginning in February 2015, DCKK, faced with grim corporate earnings and tight cash-flow without being able to resolve its "backwardation," began requesting a 20% discount of charter fees or the cancellation of charter parties without penalty from dozens of domestic ship owners, to which a considerable number of owners agreed in March, and also began selling highly profitable self-owned vessels.  Although DCKK was able to improve its earnings and cash flow to a certain degree by taking the abovementioned measures, it did not experience a drastic improvement as outside circumstances (e.g., struggling market) failed to take a favorable turn. The consolidated operating results for the first quarter of fiscal year 2015 were 5,447,000,000 yen in operating loss and 5,663,000,000 yen in ordinary loss, and it is presumed that fiscal year 2015 will once again run a large deficit.  Moreover, due to factors such as China's deteriorating

---

(based on a charter party between DCKK and the cargo owner), went aground at the port of Kashima on October 24, 2006, and became a total loss on December 27, 2006.  The High Court of Justice handed down a judgment against DCKK ordering a payment of approximately 137.6 million USD (approximately 13.6 billion yen) in damages to the vessel owner, and approximately 29 million USD (approximately 2.9 billion yen) in interest and legal costs. However, on appeal the UK Court of Appeal reversed the decision and rejected the vessel owner's claims against DCKK.  The vessel owner filed an appeal, and the case is now pending before the UK Supreme Court.

economic conditions, it is unlikely that the dry bulk tramper market will take a favorable turn.

Therefore, there is a high risk of DCKK's financial condition deteriorating further, and for it to

fall into a state of asset deficiency.

D.    **The Japan Proceeding**

*Overview of the Civil Rehabilitation Proceeding*

23.    The Japan Proceeding is an insolvency proceeding under the Japanese Civil

Rehabilitation Act (the "JCRA"), which was initially modeled after Chapter X of the United

States Bankruptcy Act of 1898 and, like the Bankruptcy Code, provides a statutory means for

debtors to reorganize their affairs.  The purpose of civil rehabilitation (*minji-saisei*) proceedings

is to enable a distressed debtor to rehabilitate, and is applicable to both individuals and

corporations.

24.    When a petition for commencement of civil rehabilitation proceedings is filed, the

court orders a preservation order which prohibits the debtor from paying any debts to the

creditors as a general rule.  Exercising any security interest, however, is not prohibited by the

JCRA, however, and thus secured creditors may collect their claims by exercising their security

interests regardless of the filing of civil rehabilitation proceedings.

25.    Generally, in these types of proceedings, the Japanese court does not appoint a

trustee, and the debtor remains in control and has the power to manage its business.  In most

cases, however, a supervisor is appointed by the court to monitor the debtor's activities.  The

debtor is required to obtain approval from the supervisor in order to conduct actions other than in

the ordinary course of business.

26.    The Japanese court must order commencement of a civil rehabilitation proceeding

in the following circumstances: if (i) there is a risk that a debtor will not be able to pay its debts

as they come due, or that a debtor's debts exceed its assets, or (ii) the debtor is unable to pay its

debts already due without causing significant hindrance to the continuation of its business.  A petition for rehabilitation will be dismissed, however, if the court finds that (a) the debtor is unlikely to prepare a rehabilitation plan, (b) the proposed plan is unlikely to be approved by creditors, or (c) the proposed plan is unlikely to be confirmed by the court.

27.    Once the civil rehabilitation proceedings have commenced in the Japanese court, unsecured creditors (including secured creditors with a claim that will exceed the value of its security) are required to file proofs of claim with the court by a court-determined date.  The debtor will then examine the amount of each unsecured claim in order to prepare and submit to the court a list of claim holders, pursuant to which the debtor expresses its intentions as to whether it approves or objects to the various claims made.  The debtor also prepares a balance sheet based upon the liquidation value of its assets and debts and submits such information to the Japanese court for review, which report will also include information such as the reasons underlying the petition and the circumstances of the debtor's business.

28.    The debtor then prepares a civil rehabilitation plan, which provides for impairment of the unsecured creditor's rights, the amount and timing of the payment, and the unsecured creditors determine whether or not to approve the proposed plan at a subsequent meeting.  The rehabilitation plan will be approved when the debtor obtains (i) the consent of a majority of voting right holders who are in attendance at the creditors' meeting (including creditors who have voted in advance by completing the necessary form), and (ii) the consent of creditors who hold voting rights that account for not less than one-half of the total amount of voting rights, and will become effective if the court confirms the plan.  Following confirmation, the debtor pays its debts according to the plan, and will be discharged from any remaining obligations.

29.    The entire process generally takes five months to complete from the date of the filing of the petition until the plan is confirmed.  A timeline demonstrating this process is set forth below:



Preservation order/Appointment of a supervisor
⬇
Explanatory meeting for creditors
⬇
Commencement of civil rehabilitation proceedings
⬇
The due date for filing of proofs of claims
⬇
Submission of list of claim holders/appraisal report of property/report regarding the status of the debtor's business
⬇
Submission of the rehabilitation plan
⬇
Creditors' meeting/Approval and confirmation of the plan
⬇
Execution of the plan
⬇
Order closing the case

*Commencement of the Japan Proceeding*

30.    In order to protect DCKK's business as a going concern and retain its value, on September 29, 2015, DCKK filed a petition (the "Japan Petition") for the commencement of the Japan Proceeding in the Tokyo Court pursuant to Article 21(1) of the JCRA.  A true and correct copy of the Japan Petition, together with its English translation, is attached as Exhibit A to the Declaration.

31.    On September 29, 2015, the Tokyo Court issued a temporary restraining order and an order appointing a supervisor (collectively, the "Tokyo Court Orders").  True and correct copies of the Tokyo Court Orders, together with their English translations, are attached as Exhibits B and C respectively to the Declaration.

32.    The Tokyo Court appointed Mr. Katsuyuki Miyakawa, a Japanese attorney, as

DCKK's supervisor (the "Supervisor").  Under the Tokyo Court Orders, DCKK cannot execute any agreement with any third party, or initiate or pursue any legal proceeding, without the consent of the Supervisor.

33.     On September 29, 2015, the Supervisor, pursuant to the powers conferred upon him by under the JCRA and the Tokyo Court Orders, issued a consent authorizing (i) DCKK to file the Chapter 15 Case, and (ii) the Petitioner to serve as the foreign representative of DCKK. A true and correct copy of the application for consent and the consent issued by the Supervisor, together with an English translation, is attached as Exhibit D to the Declaration.

34.     Under the current status of the Japan Proceeding, the Supervisor does not have the powers to manage the assets of DCKK.  As a consequence, the current management of DCKK remains in place and is allowed to continue to operate its businesses as a debtor-in-possession, subject to the limitations of the supervision order.

**E.      The Center of Main Interests for DCKK is Japan**

35.     DCKK's principal office is located in Tokyo, with three branch offices located throughout Japan.  While DCKK maintains seven smaller oversees offices, including an office in New York, NY, all but 26 of DCKK's employees are located in Japan, and all officers and directors of the Debtor operate out of the Tokyo headquarters.  Moreover, the strategic decision-making and corporate functions of DCKK are primarily made out of the Tokyo headquarters. Accordingly, the center of main interests for DCKK is Tokyo, Japan, which is the location of the Japan Proceeding.

**F.      The Chapter 15 Case**

36.     Contemporaneously with the filing of the Petition, the Petitioner filed an Official Form No. 1 Chapter 15 petition for DCKK pursuant to 11 U.S.C. §§ 1504, 1509(a), and 1515(a). The purpose of this Chapter 15 Case is to seek protection for DCKK's assets in the United States

and cooperation with the Tokyo Court to permit DCKK the breathing room necessary to develop

and confirm a rehabilitation plan that maximizes payments to its rehabilitation creditors.

## VI.
## RELIEF REQUESTED

37.    The Petitioner requests the following relief provided automatically upon

recognition under § 1520 and pursuant to this Court's discretion under §§ 1521 and 105(a).  A

foreign main proceeding "means a proceeding pending the country where the debtor has the

center of its main interests."  11 U.S.C. § 1502(4).

38.    As discussed herein, the Petitioner respectfully submits that the Japan Proceeding

is a foreign main proceeding within the meaning of § 1502(4) because DCKK's center of main

interests is in Japan.   Accordingly, the Petitioner requests that the Court grant the automatic

relief available for main proceedings under § 1520, as well as other discretionary relief described

below, requested in the proposed order attached to this Petition as Exhibit A (the "Proposed

Order").

### A.    Relief Requested as Provided by Statute.

***Automatic Relief When a Foreign Proceeding is a Main Proceeding***

39.    Certain relief is automatic when a foreign proceeding is recognized as a main

proceeding, since upon recognition of a foreign proceeding that is a foreign main proceeding—

(1) sections 361 and 362 apply with respect to the debtor and the property of the
debtor that is within the territorial jurisdiction of the United States;

(2) sections 363, 549, and 552 apply to a transfer of an interest of the debtor in
property that is within the territorial jurisdiction of the United States to the same
extent that the sections would apply to property of an estate;

(3) unless the court orders otherwise, the foreign representative may operate the
debtor's business and may exercise the rights and powers of a trustee under and to
the extent provided by sections 363 and 552; and

(4) section 552 applies to property of the debtor that is within the territorial jurisdiction of the United States.

11 U.S.C. § 1520(a).

40.     Accordingly, the Petitioner seeks the above relief in the Proposed Order, recognizing the Japan Proceeding as a foreign main proceeding.

### *Automatic Relief Whether Foreign Proceeding is a Main or Nonmain Proceeding*

41.     Certain relief is automatic upon recognition of a foreign proceeding, whether a main or nonmain proceeding.   Upon recognition of a foreign proceeding, the foreign representative may intervene in any proceedings in a state or federal court in the United States in which the debtor is a party.   11 U.S.C. § 1524.   Likewise, upon recognition of a foreign proceeding, the foreign representative has standing in a case concerning the debtor pending under another chapter of this title to initiate actions under §§ 522, 544, 545, 547, 548, 550, 553, and 724(a).   *Id.* § 1523(a).  Accordingly, the Petitioner seeks such relief in the Proposed Order.

### *Discretionary Relief to Protect Creditors and DCKK*

42.     Certain discretionary relief is available upon recognition of a foreign proceeding under 11 U.S.C. § 1521 as discussed below.   The court may grant relief under § 1521 only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected.   *Id.* § 1522(a).  The Petitioner contends that the discretionary relief requested is for the protection of the creditors and the Debtor.

### *Automatic Relief Whether Foreign Proceeding is Main or Nonmain*

43.     "Any appropriate" discretionary relief is available upon recognition of a foreign proceeding, whether a foreign proceeding is main or nonmain. 11 U.S.C. § 1521(a) ("Upon recognition of a foreign proceeding, *whether main or nonmain*, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the

court may, at the request of the foreign representative, grant *any appropriate relief*.") (emphasis added).  In granting relief under § 1521 to a representative of a foreign nonmain proceeding, the court must be satisfied that the relief relates to assets that, under the law of the United States, should be administered in the foreign nonmain proceeding or concerns information required in that proceeding.  *Id.* § 1521(c).  That relief includes:

> (1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);
>
> (2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);
>
> (3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);
>
> (4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;
>
> (5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;
>
> (6) extending relief granted under section 1519(a); and
>
> (7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724 (a).

11 U.S.C. § 1521(a).

44.    In addition, under § 1521(b), upon recognition of a foreign proceeding, whether main or nonmain, the court may entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative or another person, including an examiner, authorized by the court, provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected.  Accordingly, the Petitioner seeks the above relief in the Proposed Order.

B.    **Specific Relief Requested**

45.    The Petitioner hereby respectfully requests that this Court enter an order pursuant to 11 U.S.C. §§ 105, 1507, 1517, 1520, and 1521, substantially in the form of the Proposed Order providing the following relief:

- Recognition of the Japan Proceeding as a foreign main proceeding as defined in § 1502(4).

- Granting the Petitioner the relief afforded under § 1520 as is provided by right upon the recognition of the Japan Proceeding as a foreign main proceeding, with the specification that the Petitioner may operate DCKK's business pursuant to § 1520(a)(3).

- Granting further additional relief as authorized by § 1521, including without limitation:

  ○ Staying the commencement or continuation of any action or proceeding concerning the assets, rights, obligations or liabilities of DCKK, including any action or proceeding against the Petitioner in his capacity as foreign representative of DCKK, to the extent not stayed under § 1520(a);

  ○ Staying execution against the assets of DCKK to the extent not stayed under § 1520(a);

  ○ Suspending the right of any person or entity other than the Petitioner to transfer or otherwise dispose of any assets of DCKK to the extent not suspended under § 1520(a), unless authorized in writing by the Petitioner or by order of this Court;

  ○ Providing for the examination of witnesses, the taking of evidence, the production of documents, or the delivery of information concerning the

assets, affairs, rights, obligations, or liabilities of DCKK, and finding that

such information is required in the Japan Proceeding under the law of the

United States; and

  ○  Entrusting Petitioner with the administration or realization of all or part of

  the assets of DCKK within the territorial jurisdiction of the United States.

● Otherwise granting comity to and giving full force and effect to the Tokyo Court,

the Japan Proceeding, and the Tokyo Court Orders.

● Awarding the Petitioner such other and further relief as this Court deems just and

appropriate.

## VII.
## BASIS FOR RELIEF REQUESTED

46.     The Petitioner submits the following bases for the above-requested relief.

### A.     Statutory Authority

47.     A chapter 15 case is commenced when a foreign representative files a petition for

recognition of a foreign proceeding.  11 U.S.C. § 1515; *In re Oversight & Control Comm'n of

Avanzit, S.A.*, 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008).  The petition must be accompanied by

certain documentary evidence, which the court may presume to be authentic.  11 U.S.C.

§ 1516(b).  The Court must grant the request for recognition if it finds:

(1) such foreign proceeding for which recognition is sought is a foreign main
proceeding or foreign nonmain proceeding within the meaning of section 1502;

(2) the foreign representative applying for recognition is a person or body; and

(3) the petition meets the requirements of section 1515.

*Id.* § 1517(a).

48.     A decision or certificate from a foreign court indicating the foreign proceeding is

a "foreign proceeding," as defined in § 101(23), is presumptively correct.  *Id.* § 1516(a).

Similarly, a decision or certificate from a foreign court indicating that the foreign representative is a "foreign representative," as defined in § 101(24), is presumptively correct.  *Id.*

49.      In order to protect DCKK's assets and prevent any further diminution in value while it attempts to restructure, DCKK commenced the Japan Proceeding on September 29, 2015 in the Tokyo Court.   Accordingly, as discussed herein, (a) the Japan Proceeding is a foreign proceeding under the definition of 11 U.S.C. § 101(23), (b) the Petitioner is a foreign representative under the definition of 11 U.S.C. § 101(24) and is a "person" under the definition of 11 U.S.C. § 101(41), and (c) this Petition meets the requirements of Section 1515, namely, the evidence of the existence of the foreign proceeding and the appointment of the foreign representative have been provided.   <u>See</u> Declaration.   Accordingly, the requirements for recognition of the Japan Proceeding as a foreign proceeding have been met.

**B.      <u>Rule Requirements for Recognition of the Japan Proceeding</u>**

50.      A petition for recognition of a foreign proceeding under chapter 15 of the Code must state the country where the debtor has its "center of main interests."  FED. R. BANKR. P. 1004.2(a).  The center of main interests for DCKK is Japan.  This attestation has been provided in DCKK's Official Form 1 Petition and in the Declaration.

51.      The petition for recognition must also identify each country in which a foreign proceeding by, regarding, or against the debtor is pending.  *Id.*  DCKK is a debtor in a foreign proceeding as described in Tokyo Court Orders.  This information has also been provided in DCKK's Official Form 1 Petition, the Declaration and the *Statement of Foreign Representative Pursuant to Fed. R. Bankr. P. 1007(a)(4)* (the "<u>Statement</u>") filed contemporaneously with the Petition.

52.      A foreign representative filing a petition for recognition under chapter 15 shall file with the petition a corporate ownership statement containing the information described in

Rule 7007.1. FED. R. BANKR. P. 1007(a)(4). Such a corporate ownership statement was made in the Statement.

53.     A foreign representative filing a petition for recognition under chapter 15 must file with the petition (unless the court orders otherwise) a list containing the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and all entities against whom provisional relief is being sought under § 1519. *Id.* This information was provided in the Statement.

**C.      Requirements for a Petition for Recognition**

54.     A petition for recognition must be accompanied by any one of the following:

(1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

(2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

(3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

11 U.S.C. § 1515(b).

55.     Accordingly, in compliance with § 1515(b), attached to the Declaration are the Tokyo Court Orders, all of which may be presumed authentic. *See id.* § 1516(b).

**D.      The Japan Proceeding Is a "Foreign Proceeding"**

56.     The Japan Proceeding is a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code. That section provides, in pertinent part, as follows:

The term "foreign proceeding" means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

57.     The Japan Proceeding falls squarely within the definition of "foreign proceeding."
DCKK has applied for protection under the JCRA to restructure its debts and maximize value for
all stakeholders under the supervision of the Tokyo Court.   Further, the Japan Proceeding is
collective in nature because all affected creditors are involved and have the opportunity to
participate and DCKK intends to continue its negotiations with creditors to develop a proposed
global restructuring plan within the context of the Japan Proceeding.   Indeed, bankruptcy courts
routinely recognize chapter 15 cases filed under Japan's federal bankruptcy and insolvency
statutes to be "relating to insolvency."   *See, e.g.*, *In re MtGox Co., Ltd.*, No. 14-31229 (Bankr.
N.D.Tex. June 19, 2014); *In re The Sanko Steamship Co, Ltd.*, Bankr. Case No. 12-12815
(Bankr. S.D.N.Y. Aug 8, 2012); *In re Elpida Memory, Inc.*, No. 12-10947 (Bankr. D. Del. Apr.
24, 2012); *In re Japan Airlines Corp., et al.*, No. 10-10198 (Bankr. S.D.N.Y. Feb. 17, 2010).
cordingly, the instant proceedings concern a "foreign proceeding" within the meaning of section
101(23) of the Bankruptcy Code.

E.      **The Petitioner Is a "Foreign Representative"**

58.     This Chapter 15 Case was commenced by the Petitioner, in his capacity as a
President and "foreign representative" of DCKK within the meaning of section 101(24) of the
Bankruptcy Code.   That section defines "foreign representative" as "a person or body, including
a person or body appointed on an interim basis, authorized in a foreign proceeding to administer
the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative
of such foreign proceeding."   11 U.S.C. § 101(24).

59.     Under the current status of the Japan Proceeding, the Supervisor does not have the
powers to manage the assets of DCKK.   As a consequence, the current management of DCKK

remains in place and is allowed to continue to operate its businesses as a debtor-in-possession. However, DCKK cannot initiate or pursue any legal proceeding without the consent of the Supervisor.  On September 29, 2015, the Supervisor, pursuant to the powers conferred upon him by under the JCRA and the Tokyo Court Orders, issued a consent that the Petitioner could file the Chapter 15 Case as the foreign representative of DCKK.  A true and correct copy of the consent issued by the Supervisor is attached as Exhibit F to the Declaration.

60.     Moreover, the Court is entitled to presume that the Petitioner is a proper "foreign representative" because the consent executed by the Supervisor to permit the Petitioner to commence the instant proceeding was authorized by the Tokyo Court Orders.  *See* 11 U.S.C. § 1516(b).  Accordingly, the Petitioner is a proper "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code.

**F.    This Case Was Properly Commenced Under Chapter 15**

61.     The Petitioner duly and properly commenced the Chapter 15 Case as required by sections 1504 and 1509 of the Bankruptcy Code, by filing the Petition accompanied by all documents required by section 1515(b) and (c).  *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Inc.*, 374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007), *aff'd* 389 B.R. 325 (S.D.N.Y. 2008)("A case under chapter 15 is commenced by a foreign representative filing a petition for recognition of a foreign proceeding under section 1515 of the Bankruptcy Code.").  Because the Petitioner has satisfied the requirements set forth in section 1515 of the Bankruptcy Code, it has properly commenced the Chapter 15 Case.

**G.    The Japan Proceeding Should Be Recognized as a Foreign Main Proceeding Because Japan Is the Location of DCKK's Center of Main Interests**

62.     A foreign proceeding shall be recognized as a "foreign main proceeding" if it is pending in the country where the debtor has the center of its main interests. 11 U.S.C. § 1517(b).

The term "center of main interests" is not defined in the Bankruptcy Code.  The "center of main interests," however, has been equated with a debtor's principal place of business.  *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 BR at 336 (citing *In re Tri-Continental Exch. Ltd.*, 349 B.R. 627, 629 (E.D. Cal. 2006)).  In the instant matter, DCKK's "center of main interests" is presumptively Japan on the basis that it is incorporated in Japan.

63.     Further, courts have equated a debtor's "center of main interests" with its principal place of business, examining factors such as the location of the debtor's headquarters, management, assets, creditors, and the jurisdiction of controlling law.  *See Millennium Global Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 70 (Bankr. S.D.N.Y. 2011) ("In determining the ["center of main interests"] of a foreign debtor, cases has examined a number of factors, including: the location of the debtor's headquarters, the location of those who actually manage the debtor (which, conceivably could be the headquarters of the holding company), the location of the debtor's primary assets, the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.") (quoting *In re SPhinX*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006), *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007).  Here, all evidence as to DCKK's operations and management is consistent with the notion that its "center of main interests" is Tokyo:

(i)     DCKK has its headquarters and principal executive offices at 14-4 Shintomi 2-chrome, Chuo-ku, Tokyo, Japan 104-8544.

(ii)    All of DCKK's directors and officers are located in Japan, and all but 26 of DCKK's 224 employees are located in Japan.

(iii)   All of DCKK's administrative functions, including accounting, financial reporting, budgeting, and cash management, are conducted in Japan.

(iv)   DCKK's major financial creditors are all located in Japan.

Accordingly, the Petitioner respectfully submits that Japan is the location of DCKK's "center of main interests" and as such the Japan Proceeding constitutes a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code.

## H.   This Court Should Extend Comity and Cooperation to the Japan Proceeding

64.   Upon recognition of a foreign proceeding under 11 U.S.C. § 1517, a U.S. court must grant comity or cooperation to the foreign representative.  11 U.S.C. § 1509(b)(3).  This requirement is subject to any limitations that the court may impose consistent with the policy of chapter 15.  *Id.* §§ 1509(b); 1506.  Consistent with § 1501, the court shall cooperate to the maximum extent possible with a foreign court or a foreign representative, either directly or through the trustee.  *Id.* § 1525(a).  Accordingly, the Petitioner seeks comity and cooperation of this Court with respect to the Tokyo Court and the Tokyo Court Orders.

65.   A central tenet of chapter 15 is the importance of comity in cross-border insolvency proceedings.  *Ad Hoc Grp. of Vitro Noteholders v. Vitro SAB De CV (In re Vitro SAB De CV)*, 701 F.3d 1031, 1053 (5th Cir. 2012).

66.   The Supreme Court defined comity over a century ago as follows:

"Comity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other.  But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.

*Hilton v. Guyot*, 159 U.S. 113, 143 (1895); *see also Vitro*, 701 F.3d at 1043–44.

67.   United States courts have previously recognized that Japanese insolvency law is "consonant with and complimentary to the principal features which govern the United States' Bankruptcy Code."  *In re Petition of Kojima*, 177 B.R. 696, 701-04 (Bankr. D. Colo. 1995)

(granting petition of Japan bankruptcy proceeding and allowing commencement of ancillary proceeding under former section 304). Indeed, courts in this and other districts have previously recognized Japanese insolvency proceedings, whether under the JCRA or otherwise, as "foreign main proceedings." *See, e.g., In re MtGox Co., Ltd.*, No. 14-31229 (Bankr. N.D.Tex. June 19, 2014); *In re Japan Airlines Corp., et al.*, No. 10-10198 (Bankr. S.D.N.Y. Feb. 17, 2010); *In re Elpida Memory, Inc.*, No. 12-10947 (Bankr. D. Del. Apr. 24, 2012); *In re Spansion Japan Ltd.*, Case No. 09-11480 (Bankr. D. Del. May 28, 2009); *In re Namirei-Showa Co., Ltd.*, No. 08-13256 (BRL) (Bankr. S.D.N.Y. Sept. 22, 2008); *In re Three Estates Co., Ltd.*, No. 07-23597 (Bankr. E.D. Cal. Aug. 30, 2007).

68.    Accordingly, the relief requested herein is consistent with the public policy of the United States.

I.    **Provisional Relief Requested by the Petitioner is Within the Scope of Section 1519 and is Appropriate Under the Circumstances**

69.    By the Motion filed contemporaneously herewith, the Petitioner seeks entry of a temporary restraining order (i) staying execution against the assets of DCKK and applying section 362 of the Bankruptcy Code in the Chapter 15 Case on a provisional basis pursuant to sections 1519(a)(1), 1519(a)(3) and 105(a) of the Bankruptcy Code, and (ii) scheduling a hearing on the Petitioner's request for a preliminary injunction extending such relief until such time as the Court enters an order disposing of the Petition.

70.    The Petitioner believes that an order staying the execution against the assets of DCKK and extending the protections afforded by section 362 in this Chapter 15 Case is crucial to prevent irreparable injury to the value of DCKK's assets and to preserve the integrity of DCKK as a going concern, so that it will not be subject to the diminution in value that would result from piecemeal collection or enforcement efforts of creditors. In particular, DCKK faces

the real and immediate risk that its worldwide fleet is subject to attachment in the United States. The attachment of vessels owned, chartered, and/or operated by DCKK would significantly disrupt its business.

### *The Relief Requested is Authorized by Sections 1519(a)(1), (a)(3) and 105(a)*

71.     Section 1519(a) of the Bankruptcy Code expressly authorizes the Court to grant "relief of a provisional nature" from the time of filing a petition for recognition until the court rules on the petition, where such relief is "urgently needed to protect the assets of the debtor or the interests of creditors." 11 U.S.C. § 1519(a). Such relief includes "staying execution against the debtor's assets." *Id*. at (a)(1). In addition, section 1519(a)(3) authorizes this Court to grant, on a provisional basis, the relief available under section 1521(a)(7), which in turn provides for any relief available to a trustee, subject to certain statutory exceptions not relevant here. Section 105(a) of the Bankruptcy Code further allows the Court to "issue any order … necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. § 105(a). The Court is, therefore, authorized to apply section 362 of the Bankruptcy Code in DCKK's Chapter 15 Case because the protections afforded by that section constitutes "relief that may be available to a trustee." 11 U.S.C. § 1519(a)(3). Although section 362 of the Bankruptcy Code would automatically be applicable in this Chapter 15 Case upon recognition of the Japan Proceeding as a foreign main proceeding, this Court has discretion to grant such relief prior to recognition on a provisional basis to preserve the estate during the pendency of the Petition.

72.     Courts have stayed execution against a debtor's assets on a provisional basis in a number of chapter 15 cases, including many involving shipping company debtors faced with similar risks of attachment. *See, e.g., In re The Sanko Steamship Co., Ltd.*, No. 12-12815 (Bankr. S.D.N.Y. July 2, 2012); *In re Chembulk New York PTE Ltd., et al.*, No. 12-11007

(Bankr. S.D.N.Y. Mar. 23, 2012); *In re Pt. Arpeni Pratama Ocean Line TBK*, No. 11-15691

(Bankr. S.D.N.Y. Dec. 23, 2011); *In re Farenco Shipping Co. Ltd.*, No. 14138 (Bankr. S.D.N.Y.

Sept. 7, 2011); *In re Korea Line Corp.*, No. 11-10789 (Bankr. S.D.N.Y. Mar. 21, 2011); *In re

Transfield ER Cape Limited (BVI)*, No. 10-16270 (Bankr. S.D.N.Y. Dec. 7, 2010).  As is the case

here, all of these cases involved international shipping companies faced with the substantial risk

that their assets would be subject to attachment in the United States.

73.    Moreover, section 362 has been applied on a provisional basis in a number of

chapter 15 cases.  *See, e.g., In re The Sanko Steamship Co., Ltd.*, No. 12-12815 (Bankr. S.D.N.Y.

July 2, 2012); *In re Valle Foam Indus. (1995) Inc.*, No. 12-30214 (Bankr. N.D. Ohio Jan. 27,

2012) (applying section 362(a)(1) on a provisional basis to stay litigation against the petitioners);

*In re Satisfied Brake Prods., Inc.*, No. 11-51427 (Bankr. E.D. Ky. May 19, 2011) (applying

section 362 on a provisional basis); *In re Japan Airlines Corp., et al.*, No. 10-10198 (Bankr.

S.D.N.Y. Jan. 28, 2010) (same).

### *The Circumstances Satisfy the Standards for Injunctive Relief*

74.    Relief under section 1519 of the Bankruptcy Code is available where the foreign

representative can satisfy the standard for injunctive relief.  11 U.S.C. § 1519(e).  In the Second

Circuit, "a movant seeking injunctive relief must demonstrate: (1) irreparable harm absent

injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to

the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in

the plaintiffs favor; and (3) that the public's interest weighs in favor of granting an injunction."

*Metro Taxicab Bd. of Trade v. City of N.Y.*, 615 F.3d 152, 156 (2d Cir. 2010).  This standard is

satisfied here.

> a.    *A substantial threat of irreparable injury exists if the injunction is not issued*

75.     The Japan Proceedings and papers submitted in conjunction therewith establish that DCKK is at a high risk of its financial condition deteriorating and falling into a state of asset deficiency.  As a result, the Petitioner is concerned that these facts may cause creditors to seek prejudgment attachments and other remedies against DCKK and its assets in the United States, particularly when DCKK's vessels make ports of call in the United States in the interim period prior to recognition of DCKK's Chapter 15 Case.  The Petitioner's ability to successfully reorganize in the Japan Proceedings depends upon DCKK's ability to maximize the value of its assets without the interference of creditors attaching and/or arresting DCKK's vessels as they conduct their business.  Without the protection afforded by the requested provisional relief, the efforts of any one creditor of DCKK may have a cascading effect and result in significant erosion in enterprise value to the detriment of all of DCKK's creditors.  Indeed, avoiding such harm is the principal purpose of the automatic stay under the Bankruptcy Code.  *See* H.R. Rep, 595, 95th Cong., 1st Sess. 340 (1977) (noting that the stay "gives the debtor a breathing spell from his creditors").  Moreover, it has been held that "the premature piecing out of property involved in a foreign liquidation proceeding constitutes irreparable injury."  *In re Lines*, 81 B.R. 267, 270 (Bankr. S.D.N.Y. 1988).

76.     In the instant matter, the risk is especially heightened because, as an international shipping company, DCKK's principal revenue-producing assets, its vessels, are at substantial risk of attachments by its creditors in the United States.  Accordingly, DCKK's ability to reorganize in the Japan Proceeding would be adversely affected if provisional relief is not ordered.

### b.    *A substantial likelihood of success on the merits exists*

77.    There is no difficult real issue on whether the Japan Proceedings should be recognized, as other courts have recognized Japan insolvency proceedings and the proper documentation has been submitted.  The Petitioner also contends that the center of main interests is in Japan, since the headquarters, management, most employees, and the majority of claims are in Japan.  Accordingly, there is a substantial likelihood that the mandatory relief under § 1520 will be ordered.

### c.    *The threatened injury to DCKK outweighs any damage the injunction might cause*

78.    Any threatened injury to DCKK outweighs any damage the injunction might cause to the opponents.  The requested provisional relief would actually benefit DCKK's creditors by ensuring an equitable and orderly distribution of assets and facilitate the Japan Proceeding.  *See In re Crystallex Int'l Corp.*, No. 11–14074 (Bankr. D. Del. Dec. 28, 2011), ECF No. 20 (stating that failing to issue a restraining order against creditors in a chapter 15 case could "undermine the Petitioner's efforts to achieve an equitable result for the benefit of all of the Foreign Debtor's creditors").

### d.    *The injunction will not disserve the public interest*

79.    The provisional relief will serve, not disserve, the public interest.  Such relief sets to facilitate a cross-border proceeding that will provide a benefit to DCKK's estate.  The provisional relief is supported by notions of comity and will allow DCKK to craft a productive solution for its creditors and its estate.

80.    In sum, the relief sought is necessary and appropriate, in the interest of the public and international comity, consistent with the United States public policy, and will not cause any hardship to any party in interest that is not outweighed by the benefits of granting the requested

relief.

### *The Petitioner Should Not Be Required to Post Bond*

81.     The Petitioner respectfully suggests that no bond be required under Fed. R. Bankr. P. 7065 and Fed. R. Civ. P. 7065(c).  A temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c).  FED. R. BANKR. P. 7065.  The Petitioner, who is carrying out the authorization granted by the Supervisor pursuant to the powers conferred upon him by under the JCRA and the Tokyo Court Orders, is akin to a trustee, and any bond would come from DCKK's assets. Without such relief, DCKK will be exposed to the risk of litigation and other actions against it and its estate and assets in the United States, which would result in a "race to the courthouse" among creditors and other parties in interest.

## VIII.
## <u>PRAYER</u>

WHEREFORE, the Petitioner respectfully requests that this Court enter the proposed order attached as <u>Exhibit A</u> to this Petition, thereby recognizing the Japan Proceeding as the foreign main proceeding and granting the relief requested herein and all other relief, at law or in equity, to which the Petitioner is justly entitled.  Alternatively, the Petitioner requests that this Court recognize the Japan Proceeding as a foreign nonmain proceeding and grant the relief requested pursuant to 11 U.S.C. § 1521.

Dated:  September 29, 2015

Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**


By: ___/s/ *David A. Rosenzweig*_____
    David A. Rosenzweig, Esq.
    Melanie M. Kotler, Esq.
    NORTON ROSE FULBRIGHT US LLP
    666 Fifth Avenue
    New York, NY 10103-3198
    Telephone: (212) 318-3000
    Facsimile:  (212) 318-3400
    david.rosenzweig@nortonrosefulbright.com
    melanie.kotler@nortonrosefulbright.com

    Kristian W. Gluck, Esq.
    Gregory M. Wilkes, Esq.
    Timothy S. Springer, Esq.
    NORTON ROSE FULBRIGHT US LLP
    2200 Ross Avenue, Suite 3600
    Dallas, Texas  75201-7932
    Telephone: (214) 855-8000
    Facsimile:  (214) 855-8200
    kristian.gluck@nortonrosefulbright.com
    greg.wilkes@nortonrosefulbright.com
    tim.springer@nortonrosefulbright.com

    COUNSEL FOR THE PETITIONER
    MASAKAZU YAKUSHIJI,
    FOREIGN REPRESENTATIVE OF DAIICHI
    CHUO KISEN KAISHA

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, Masakazu Yakushiji declares as follows:

I am Masakazu Yakushiji and I was appointed in my capacity as the foreign representative of Daiichi Chuo Kisen Kaisha in a proceeding under the Corporate Reorganization Act of Japan, pending before the Tokyo District Court, Civil Department [*No. 20*]. I have full authority to verify the foregoing *Verified Petition For Recognition As Foreign Main Proceeding Pursuant To Sections 1515 And 1517 Of The United States Code And Related Relief And Memorandum In Support* (the "Petition"). I have read the Petition and am informed and do believe that the allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 29th day of September, 2015, in Tokyo, Japan

_____

Masakazu Yakushiji
Foreign Representative of
Daiichi Chuo Kisen Kaisha