David A. Rosenzweig, Esq.
Melanie M. Kotler, Esq.
NORTON ROSE FULBRIGHT US LLP
666 Fifth Avenue
New York, NY 10103-3198
Telephone: (212) 318-3000
Facsimile:  (212) 318-3400
david.rosenzweig@nortonrosefulbright.com
melanie.kotler@nortonrosefulbright.com

Kristian W. Gluck, Esq.
Gregory M. Wilkes, Esq.
Timothy S. Springer, Esq.
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas  75201-7932
Telephone: (214) 855-8000
Facsimile:  (214) 855-8200
kristian.gluck@nortonrosefulbright.com
greg.wilkes@nortonrosefulbright.com
tim.springer@nortonrosefulbright.com

COUNSEL FOR THE PETITIONER MASAKAZU YAKUSHIJI,
FOREIGN REPRESENTATIVE OF DAIICHI CHUO KISEN KAISHA

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re:** § § | **CASE NO. 15-12650** |
| **DAIICHI CHUO KISEN KAISHA,** § § | **Chapter 15** |
| Debtor in a foreign proceeding. § | |

**DECLARATION OF MASAKAZU YAKUSHIJI**

I, Masakazu Yakushiji, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am over the age of 18 and, if called upon, could testify as to the facts set forth in this declaration, except for those portions specified as being otherwise.

2. I am a President and foreign representative (the "Petitioner") of Daiichi Chuo Kisen Kaisha ("DCKK"), a debtor in a civil rehabilitation proceeding under Japanese law (the "Japan Proceeding") currently pending as Case No. Heisei 27 (2015) (Sai) 53 before the 20th Civil Division of the Tokyo District Court, Japan (the "Tokyo Court").

3. All facts set forth in this declaration are based on: (i) my personal knowledge; (ii) my review of relevant documents; or (iii) my opinion based on my experience and knowledge of DCKK's operations.

4. This declaration is respectfully submitted as required under (i) section 1515(c) of title 11 of the United States Code (as amended, the "Bankruptcy Code") in support of the *Verified Petition for Recognition as Foreign Main Proceeding Pursuant to Sections 1515 and 1517 of the United States Code and Related Relief* (the "Petition") seeking, among other things, recognition by this Court of the Japan Proceeding as a "foreign main proceeding"[1] under section 1517 of the Bankruptcy Code, and (ii) Rule 65(b) of the Federal Rules of Civil Procedure, made applicable in this chapter 15 case under Rule 7065 of the Federal Rules of Bankruptcy Procedure and Rule 9077-1 of the Local Bankruptcy Rules for the Southern District of New York, in support of the *Ex Parte Application for Temporary Restraining Order and, After Notice and a Hearing, a Preliminary Injunction, Pursuant to Sections 1519 and 105(a) of the Bankruptcy Code* (the "Motion") filed contemporaneously herewith seeking, among other things, the entry on an *ex parte* basis of an order to show cause with a temporary restraining order substantially in the form attached as Exhibit A to the Motion.

**DCKK's Business**

5. DCKK is a joint-stock company incorporated under Japanese law in 1960. In addition to its principal domestic Japanese offices in Tokyo, Kansai, Wakayama and Kashima, where the majority of DCKK's employees are located, DCKK has ancillary offices in New York (opened in 1969), Manila, Hong Kong, London, Shanghai, Brisbane and Vietnam. DCKK's core

---

[1] Although the Petitioner is confident that the Japan Proceeding is a foreign main proceeding within the definition of Bankruptcy Code section 1502(4), in an abundance of caution, the Petitioner reserves the right to argue, in the alternative, that the Japan Proceeding is a foreign nonmain proceeding within the definition of Bankruptcy Code section 1502(5) and to seek appropriate relief under Bankruptcy Code section 1521 and any other applicable provision of the Bankruptcy Code.

business is marine transportation, providing overseas shipping, coastal shipping[2] and other related services, focusing primarily on transporting dry bulk (bulk cargo such as unpackaged grain, iron ore and other commodities) using a tramp steamer, commonly referred to as a tramper.

6. Unlike container ships that operate on a set route and set schedule, a tramper does not have a fixed schedule or regular ports-of-call. Instead, its schedule is determined according to the request of cargo owners (i.e, the customers). In general, a tramper often transports cargo by time chartering vessels owned by a third party, or by using self-owned vessels or vessels owned by its *shikumisen* subsidiary.[3] In such case, a time charter contract is entered into between a third-party vessel owner and the shipping company, and the charter hire (i.e, fees) are usually specified in time charter contracts. There are many tramper operators in the world, and freight rates are often determined by the global market, based on the balance between demand for shipping/transporting and supply of freight space. The Baltic Dry Index (the "BDI"), published by the Baltic Exchange, is a leading indicator for ocean route dry bulk carriers, and is based on freight rates of trampers (the freight rate for 1985 was 1000, which serves as a benchmark for the index.) Based on this index, together with shipping routes, vessel type and contract term, the freight rates are determined between cargo owners and shipping companies.

7. DCKK's overseas shipping service is categorized into special-purpose vessel services and tramper services according to the types of vessels and their purposes. DCKK's special-purpose vessel service division is in charge of transporting specific freight, in particular

---

[2] DCKK transports cargo such as limestone, cement, coal, crushed stone, grain and general goods by special-purpose vessels and general cargo vessels within Japan for domestic consumers.

[3] A *shikumisen* company is a company incorporated in countries where tax systems are advantageous to shipping companies. The company registers and holds its vessels under that country's flags, or enters into bareboat charters with third parties; however, the vessels are actually used for the business of the parent company in accordance with time charter agreements between the *shikumisen* company and its parent company.

iron ore and coal for international and domestic steel mills by cape-size vessels (vessels with a deadweight capacity of over 150,000 tonnage). The tramper service division is made of two sections: (i) the large-scale tramper service section, which uses panamax-size vessels (vessels with a deadweight capacity of over 70,000 tonnage) and handymax-size vessels (vessels with a deadweight capacity of over 40,000 tonnage) to transport cargo such as coal and nonferrous metals to electric power companies and general industries, and (ii) the ocean tramper service section, which uses handy-size vessels (vessels with a deadweight capacity of up to 40,000 tonnage) to transport various cargo including grain.

8. As of March 31, 2015, the number of vessels owned by DCKK is as described in the following table by size, which is classified by deadweight capacity tonnage:

| Vessel Size | Owned Solely by DCKK | Owned by Subsidiaries (Including Leased Vessels) | Chartered | Total |
|---|---|---|---|---|
| Cape-size (150,000 tonnage ~) | 1 | 3 | 20 | 24 |
| Panamax size (70,000 ~ 150,000 tonnage) | 1 | 5 | 23 | 29 |
| Handymax size (40,000 ~ 70,000 tonnage) | 0 | 2 | 21 | 23 |
| Handy size (20,000 ~ 40,000 tonnage) | 0 | 13 | 34 | 47 |
| Coastal waters vessels (~ 20,000 tonnage) | 0 | 12 | 31 | 43 |
| Vessels for coastal shipping | 5 | 3 | 11 | 19 |
| **Total** | **7** | **38** | **140** | **185** |

9. As of August 1, 2015, DCKK had 224 employees, of which 162 are land-based employees (including 2 seconded workers), 23 are sea-based (crew), 9 are temporary staff and trainees, 1 is a part-time employee, and 3 are contract employees, and 26 are local employees of the overseas affiliates and branches. Thus, all but 26 of DCKK's employees are located in Japan, and only 3 are located in DCKK's New York office.

**DCKK's Capital Structure**

10. As of June 30, 2015, DCKK had assets of approximately 54,502,000,000 yen on a non-consolidated basis and approximately 107,292,000,000 yen on a consolidated basis.

| Item | Amount Non-Consolidated | Amount Consolidated |
|---|---|---|
| Current Assets | 33,076,000,000 yen | 41,199,000,000 yen |
| Tangible Fixed Assets | 9,399,000,000 yen | 61,921,000,000 yen |
| Intangible Fixed Assets | 44,000,000 yen | 117,000,000 yen |
| Investments and Other Assets | 11,983,000,000 yen | 4,054,000,000 yen |
| **Total** | **54,502,000,000 yen** | **107,292,000,000 yen** |

11. As of June 30, 2015, DCKK had liabilities of approximately 119,607,592,978 yen on a non-consolidated basis.

| Type of Debt | Amount | Number of Creditors |
|---|---|---|
| Financial Creditors (Banks) | 24,330,768,124 yen | 17 creditors |
| Creditors With Loans Receivable (Vessel Owners, Broker, etc.) | 2,285,933,759 yen | 23 creditors |
| Derivative Creditors | 117,178,095 yen | 1 creditor |
| Bond Holders (Private Placement Bonds) | 4,419,419,497 yen | 37 creditors |
| Guaranteed Creditors | 76,254,279,805 yen | 26 creditors |
| Lease Creditors | 61,794,100 yen | 4 creditors |
| Affiliate Company Creditors | 5,659,182,022 yen | 16 creditors |
| General Creditors | 6,434,884,040 yen | 461 creditors |
| Tax and Public Charge Creditors | 44,153,536 yen | 12 creditors |
| Total | 119,607,592,978 yen | 608 creditors |

**Business Challenges**

12. Beginning in September 2008 with the global financial crisis caused by the collapse of Lehman Brothers, a sizable drop in cargo movements took place worldwide. In May 2008, the BDI was 11,067, but took a plunge in September 2008, and dropped to 666 by December 2008. The downturn in the shipping industry greatly impacted DCKK given that it relies heavily on voyage charter vessels for a large percentage of its business.

13. Before the collapse of Lehman Brothers, DCKK was working on expanding its fleet, entering into many long-term time charter agreements between ship owners that obligated it to pay a substantial amount in charter fees, whereas most charter party agreements are spot contracts, and freight rates are based on the then-stagnant maritime market. Therefore, the charter fees that DCKK had to pay were quite high, while freight charges paid to DCKK remained very low, and as a result, DCKK ended up in a "backwardation" in which the charter fees exceeded its freight revenue. In addition, factors such as the increase in debt burden due to newly-built vessels, a lack of funding, the rise of the Japanese yen and the rise of fuel prices contributed to DCKK's worsening cash-flow problems.

14. For the fiscal year ending March 2009, DCKK's operating profit showed a 93.3% decrease over the previous year, resulting in an ordinary income loss of 2,118,000,000 yen and net income loss of 3,635,000,000 yen, and, on a consolidated basis, an ordinary income loss of 928,000,000 yen and current net loss of 2,939,000,000 yen.

15. After 2009, DCKK began terminating charter parties in an attempt to reduce vessel expenses, and it regained profitability during the fiscal year ending March 2011, the last fiscal year it would post an operating profit. Subsequently, DCKK tried to take advantage of the decreasing ship prices and resumed its fleet expansion in anticipation of market recovery. However, the market continued to decline, and, for the fiscal year ending March 2012, DCKK posted an ordinary income loss of 11,775,000,000 yen and net income loss of 12,588,000,000 yen, and, on a consolidated basis, an ordinary income loss of 11,002,000,000 yen and current net loss of 9,281,000,000 yen.

16. In late 2012, DCKK began to (i) adjust the scale of its fleet by increasing the percentage of medium and small-sized vessels (which were expected to be in high demand) to

secure a steady income, (ii) cut costs by terminating charter parties for about 20 of the high-cost vessels, and (iii) increase capital and secure operating funds by selling owned vessels and issuing classified stock,[4] as well as deferring loans and charter fee payments.  However, the recovery of the medium and small-sized vessel market was moderate, and there was also a need to pay extensive cancellation fees in order to terminate charter parties of high-cost vessels causing "backwardation."  As a result, for the fiscal year ending March 2013, DCKK posted an ordinary income loss of 20,128,000,000 yen and net income loss of 32,301,000,000 yen, and, on a consolidated basis, an ordinary income loss of 18,563,000,000 yen and current net loss of 31,983,000,000 yen.

17.    In March 2014, DCKK increased capital and secured operating funds by issuing more classified stock,[5] downsized its fleet, made cost reductions and restructured its tramper services business in Asian waters.  DCKK anticipated that these measures would reduce losses for fiscal year 2014 to be 3,300,000,000 yen.  While DCKK's tramper services in Asian waters (mainly Southeast Asia, China, Russia) and its domestic shipping business improved, market conditions in the shipping industry continued to deteriorate, and by the end of 2014, the cape-size vessel market reached an all-time low.  As a result, for the fiscal year ending March 2014, DCKK posted an ordinary income loss of 4,366,000,000 yen and net income loss of 13,459,000,000 yen, and, on a consolidated basis, an ordinary income loss of 8,584,000,000 yen and current net loss of 15,429,000,000 yen.[6]

---

[4] DCKK raised 31,400,000,000 yen by issuing class A shares to its largest shareholder, Mitsui O.S.K. Lines, Ltd., and other business partners.

[5] DCKK raised 8,500,000,000 yen by issuing class D shares to outside investors.

[6] The loss for fiscal year 2014 includes a provision for loss (5,900,000,000 yen) relating to the first instance verdict in the Ocean Victory litigation in the UK High Court of Justice.  In 2006, the "Ocean Victory", a cape-size bulk carrier time-chartered by DCKK from the vessel owner (China National Chartering Corp.) to transport iron ore (based on a charter party between DCKK and the cargo owner), went aground at the port of Kashima on October 24, 2006, and became a total loss on December 27, 2006.  The High Court of Justice handed down a judgment against

18.     The gap between supply and demand for medium-sized vessels (excluding cape-size vessels) continued into 2015.  As a result, it became difficult for DCKK, who mainly focuses its business on transporting dry bulk using trampers (which is greatly influenced by the maritime market), to generate profit as its revenue continued to decline due to the market's prolonged stagnation, and DCKK has been stuck in the same inextricable situation.  DCKK's performance for the fiscal year of March 2015 was an ordinary income loss of 14,256,000,000 yen and net income loss of 2,660,000,000 yen, and, on a consolidated basis, an ordinary income loss of 13,966,000,000 yen and current net loss of 3,307,000,000 yen (including 3,412,000,000 yen as profit from the sale of vessels and 5,763,000,000 yen to reverse a provision for loss on litigation after winning the appeal in the Ocean Victory litigation pending in the UK).

19.     Beginning in February 2015, DCKK, faced with grim corporate earnings and tight cash-flow without being able to resolve its "backwardation," began requesting a 20% discount of charter fees or the cancellation of charter parties without penalty from dozens of domestic ship owners, to which a considerable number of owners agreed in March, and also began selling highly profitable self-owned vessels.  Although DCKK was able to improve its earnings and cash flow to a certain degree by taking the abovementioned measures, it did not experience a drastic improvement as outside circumstances (e.g., struggling market) failed to take a favorable turn.  The consolidated operating results for the first quarter of fiscal year 2015 were 5,447,000,000 yen in operating loss and 5,663,000,000 yen in ordinary loss, and it is presumed that fiscal year 2015 will once again run a large deficit.  Moreover, due to factors such as China's deteriorating economic conditions, it is unlikely that the dry bulk tramper market will take a favorable turn.

---

DCKK ordering a payment of approximately 137.6 million USD (approximately 13.6 billion yen) in damages to the vessel owner, and approximately 29 million USD (approximately 2.9 billion yen) in interest and legal costs.  However, on appeal the UK Court of Appeal reversed the decision and rejected the vessel owner's claims against DCKK.  The vessel owner filed an appeal, and the case is now pending before the UK Supreme Court.

Therefore, there is a high risk of DCKK's financial condition deteriorating further, and for it to fall into a state of asset deficiency.

### DCKK's Japan Proceeding and Civil Rehabilitation Under The JCRA

20. In order to protect DCKK's business as a going concern and retain its value, on September 29, 2015, DCKK filed a petition (the "Japan Petition") for the commencement of the Japan Proceeding in the Tokyo Court pursuant to Article 21(1) of the Japan Civil Rehabilitation Act (the "JCRA"). A true and correct copy of the Japan Petition, together with its English translation, is attached hereto as Exhibit A. The Japan Proceeding is a civil rehabilitation, the purpose of which is to formulate a rehabilitation plan as consented to by a requisite number of creditors and confirmed by the Tokyo Court, to appropriately coordinate the relationships of rights between creditors and DCKK, with the aim of ensuring rehabilitation of DCKK's business.

21. On September 29, 2015, the Tokyo Court issued a temporary restraining order and an order appointing a supervisor (collectively, the "Tokyo Court Orders"). True and correct copies of the Tokyo Court Orders, together with their English translations, are attached hereto as Exhibits B and C respectively.

22. The Tokyo Court appointed Mr. Katsuyuki Miyakawa, a Japanese attorney, as DCKK's supervisor (the "Supervisor"). Under the Tokyo Court Orders, DCKK cannot execute any agreement with any third party, or initiate or pursue any legal proceeding, without the consent of the Supervisor.

23. On September 29, 2015, the Supervisor, pursuant to the powers conferred upon him by under the JCRA and the Tokyo Court Orders, issued a consent authorizing (i) DCKK to file the Chapter 15 Case, and (ii) the Petitioner to serve as the foreign representative of DCKK.

A true and correct copy of the application for consent and the consent issued by the Supervisor is attached hereto, together with an English translation, as <u>Exhibit D</u>.

24.     Under the current status of the Japan Proceeding, the Supervisor does not have the powers to manage the assets of DCKK.  As a consequence, the current management of DCKK remains in place and is allowed to continue to operate its businesses as a debtor-in-possession, subject to the terms of the supervision order.  I understand that this is permitted under the JCRA and that DCKK has submitted the evidence legally required for the relief to be granted upon formal commencement.

25.     I understand that the schedule for the Japan Proceeding will be determined by the Tokyo Court's commencement order, and that counsel has agreed to inform this Court of that schedule promptly after it is set.

26.     Under the auspices of the Tokyo Court and with the ancillary assistance of this Court, the ultimate goal of the Japan Proceeding is to permit DCKK the breathing room necessary to develop and confirm a rehabilitation plan that maximizes payments to its rehabilitation creditors.  The protection of DCKK's assets in the United States in conjunction with the protections afforded by the Japan Proceeding is essential to this effort.  To effectuate this goal, I respectfully request the relief requested in the Petition and in the Motion.

### The Petition

27.     I have reviewed and been informed of the "foreign main proceeding" and "foreign representative" requirements necessary for recognition of a proceeding under Chapter 15 of the Bankruptcy Code.  Based upon my understanding of the relevant laws of Japan, it is my belief that the petition filed by DCKK seeking the commencement of the Japan Proceeding qualifies as a foreign judicial proceeding under a law relating to insolvency or the adjustment of debts.  The

assets and affairs of DCKK are currently subject to control or supervision by the Tokyo Court and will remain to be under such control and supervision after formal commencement of the reorganization proceeding.

28. Further, based on my understanding of the relevant laws of Japan, it is my belief that I qualify as a foreign representative and have properly received the consent of the Tokyo Court through the Supervisor, and have full authority to commence this Chapter 15 case and seek the provisional relief requested.

29. I respectfully seek entry of an order (the "Recognition Order") recognizing me as DCKK's "foreign representative," as defined in 11 U.S.C. § 101(24), and recognizing the Japan Proceeding as a foreign main proceeding as defined in 11 U.S.C. §§ 1517(a) and (b)(l).

30. To the best of my knowledge, at this time the Japan Proceeding is the only insolvency proceeding of any kind pending for DCKK and, thus, is the only known "foreign proceeding" with respect to DCKK, as that term is defined in section 101(23) of the Bankruptcy Code.

31. When the Tokyo Court issues its final order approving DCKK's reorganization plan, I will seek this Court's assistance in enforcing such final order.

**The Motion**

32. The Motion seeks immediate entry, on an *ex parte* basis, of an order to show cause with temporary restraining order to avoid considerable disruption and harm to DCKK's operations from creditors and other parties in interest potentially taking action against DCKK's assets in the United States.

33. As described above, DCKK is an international shipping company whose vessels are at substantial risk of seizure by creditors at any given time as they move from jurisdiction to

jurisdiction in the ordinary course of business, including the United States. DCKK owns 7 vessels and through its subsidiaries, also owns, operates or charters the majority of the DCKK fleet, which in total includes 185 vessels of March 31, 2015. As of today, the following vessels are in, or will enter, United States ports (sorted by date of arrival):

| Vessel Name | Port of Call | Arrival | Departure |
|---|---|---|---|
| Poavosa Wisdom III | Longview, WA | September 16, 2015 | September 29, 2015 |
| Ocean Satoko | Tampa, FL | September 27, 2015 | September 29, 2015 |
| Ocean Satoko | New Orleans, LA | October 1, 2015 | October 3, 2015 |
| Ocean Satoko | Houston, TX | October 5, 2015 | October 7, 2015 |
| ISS Breeze | Pittsburgh, PA | October 6, 2015 | October 9, 2015 |
| Sakura Ocean | Panama City, FL | October 7, 2015 | October 9, 2015 |
| Sakura Ocean | New Orleans, LA | October 10, 2015 | October 14, 2015 |
| Ocean Ibis | Portland, OR | October 12, 2015 | October 17, 2015 |
| Ocean Falcon | Port Manatee, FL | October 13, 2015 | October 16, 2015 |
| Sakura Ocean | Houston, TX | October 15, 2015 | October 17, 2015 |
| Ocean Falcon | New Orleans, LA | October 18, 2015 | October 22, 2015 |
| Ocean Falcon | Houston, TX | October 24, 2015 | October 25, 2015 |
| Moonlight Serenade | Brownsville, TX | November 8, 2015 | November 9, 2015 |
| Moonlight Serenade | Houston, TX | November 11, 2015 | November 12, 2015 |
| Ocean Gracious | Houston, TX | November 12, 2015 | November 13, 2015 |
| Ocean Gracious | New Orleans, LA | November 15, 2015 | November 17, 2015 |
| Moonlight Serenade | New Orleans, LA | November 15, 2015 | November 17, 2015 |
| Copacabana | Philadelphia, PA | December 1, 2015 | December 3, 2015 |
| Copacabana | New Orleans, LA | December 9, 2015 | December 12, 2015 |
| Copacabana | Houston, TX | December 14, 2015 | December 16, 2015 |

34.    In addition, DCKK holds stock in its New York subsidiary, Daiichi Chuo Shipping (America) Inc., and maintains bank accounts at the New York branches of The Bank of Tokyo-Mitsubishi UFJ, Ltd. and Sumitomo Mitsui Banking Corporation.

35.    In the absence of an immediate stay, creditors may commence proceedings against DCKK and attach its assets at any time. Further, there is a risk that the vessels of DCKK's affiliates may be seized as well on the basis of claims against DCKK itself or under the theory that such affiliates are "alter egos" of DCKK. Any arrests of DCKK's vessels or

35577874.4                                                                                                                                12

garnishment of hire payments due to DCKK would be devastating to the company's cash flows and severely hinder its overall reorganization efforts.

36. To protect DCKK's businesses from such disruption and to preserve value, the Motion seeks immediate entry of an order to show cause with a temporary restraining order prior to the hearing on the Motion.

37. Notice of the commencement of this chapter 15 case will be provided via electronic mail, facsimile and/or first class mail to all parties against whom relief is sought.

38. Promptly after entry of the order to show cause, notice thereof and of the Motion will be served upon the parties listed in paragraph 37 herein and on any parties that have filed notices of appearances in this chapter 15 case.

39. In light of the notice that has and will be provided with respect to the order to show cause and the Motion, and to protect DCKK's assets and businesses from irreparable harm, I respectfully submit that the request set forth in the Motion for the entry of an order to show cause with temporary restraining order on an *ex parte* basis is appropriate.

40. I declare under penalty of perjury under the laws of the United States of America that, based upon my knowledge, information and belief as set forth herein, the foregoing is true and correct.

[The Remainder of this Page Is Left Blank Intentionally]

Executed this 29th day of September, 2015, in Tokyo, Japan.

_____
Masakazu Yakushiji
Foreign Representative of
Daiichi Chuo Kisen Kaisha

[Signature Page]